IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AIRWATCH LLC,<br><br>     Plaintiff,<br><br>v.<br><br>MOBILE IRON, INC.<br><br>     Defendant. | Civil Action File No.: |

## COMPLAINT

Plaintiff AirWatch LLC ("AirWatch") files its Complaint against Defendant Mobile Iron, Inc. ("Mobile Iron") and alleges as follows:

### Parties, Jurisdiction, and Venue

1.      AirWatch is a Delaware limited liability company with its principal place of business at 1155 Perimeter Center West, Suite 100, Atlanta, Georgia 30338.

2.      AirWatch provides a software solution for enterprise management of mobile devices, including configuring and updating mobile devices over-the-air, enforcing security policies and compliance for mobile devices, securing mobile

access to corporate resources, and allowing mobile devices to be locked or wiped remotely (the "AirWatch Software").

3.      Mobile Iron is a Delaware corporation with its principal place of business at 415 East Middlefield Road, Mountainview, CA 94043.

4.      Mobile Iron is AirWatch's direct competitor in the smart mobile device space, with similar products and many of the same corporate entities as potential customers.

5.      This Court may exercise federal jurisdiction under 28 U.S.C. § 1331 of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and this Court may exercise supplemental jurisdiction over the non-federal claims herein because the non-federal claims arise out of the same facts and circumstances as the federal claim.

6.      This Court may exercise personal jurisdiction over Mobile Iron because, on September 17, 2012, Mobile Iron CEO Bob Tinker traveled to Georgia in connection with this dispute.  In addition, on information and belief, on or about September 5, 2012, Mobile Iron employees traveled to Atlanta in connection with a Mobile Iron sales pitch to an Atlanta-based company.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

US2008 3852614 9

8.      Mobile Iron may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## Background Facts

### AirWatch's Confidential, Proprietary, and Trade Secret Information

9.      In connection with the products and services that AirWatch provides to its customers, AirWatch develops and maintains sensitive, proprietary, and confidential information about its software solutions, business practices, methodologies, and customers.

10.     Certain of AirWatch's confidential and proprietary information constitute valuable trade secrets.

11.     AirWatch's trade secrets include, without limitation, AirWatch's marketing strategies and procedures, software design, know-how, negative know-how, customer information, including customer contact information, customer purchasing preferences and decisions, pricing policies and related information, and business operation procedures.

US2008 3852614 9

12.     AirWatch's confidential, proprietary, and trade secret information provides AirWatch an advantage over its competitors who have not made substantial economic and other investment in developing similar information.

13.     AirWatch's confidential, proprietary, and trade secret information is not generally or publicly known in its business of providing enterprise-wide mobile device management software.

14.     AirWatch's confidential, proprietary, and trade secret information concerns the business, financial affairs, and plans of AirWatch, including without limitation AirWatch's products and customers.

15.     AirWatch's confidential, proprietary, and trade secret information is subject to confidentiality obligations embodied in, among other things, end user license agreements, which agreements include a strict confidentiality provision in order to restrict the use of AirWatch confidential information.

16.     The standard AirWatch Software End User License Agreement ("Standard License") includes strict confidentiality provisions in order to restrict the use of AirWatch confidential information. Under the Standard License, Confidential Information of AirWatch includes, but is not limited to, the AirWatch Software, documentation (consisting of user manuals, training information, and

4

specifications), information regarding business operations, and trade secrets, which may be disclosed to the licensee.  AirWatch ensures that all potential customers and customers having access to its software and other confidential information are subject to these confidentiality restrictions.

17.     AirWatch makes efforts that are reasonable under the circumstances to maintain the secrecy of its confidential and proprietary information, including, but not limited to, restricting confidential and proprietary information on a "need to know basis," requiring its employees to sign employment agreements that restrict the disclosure of AirWatch's confidential information and trade secrets after the employee's separation, and maintaining internal policies and procedures emphasizing the importance of maintaining the secrecy of AirWatch confidential, proprietary, and trade secret information.

### Mobile Iron's Deceptive and Fraudulent Conduct

18.     On or about July 12, 2012, an individual using the name "Jeff Woodhousen" contacted AirWatch through the AirWatch website to request a free thirty-day trial of the AirWatch Software on behalf of a company called "Havenswright."

5

19.     On or about July 12, 2012, AirWatch salesperson Steven Rhee sent an email to Mr. "Woodhousen" at his Havenswright email address (JWoodhousen@havenswright.com) to follow-up on Mr. "Woodhousen's" inquiry about the free trial of the AirWatch Software and to suggest that Mr. "Woodhousen" participate in an online demonstration of the AirWatch Software (the "Demo").

20.     On or about July 13, 2012, Mr. "Woodhousen" responded to Mr. Rhee, confirmed his interest in the free trial of the AirWatch Software, and indicated, "I'd like to get this project underway.  How do I get an activation code for the trial?"  In response, Mr. Rhee proposed that Mr. "Woodhousen" schedule the Demo at a convenient time, and Mr. "Woodhousen" suggested that the Demo be arranged for Monday, July 16, 2012.

21.     On or about July 16, 2012, Mr. Rhee received an email from Mr. "Woodhousen" inquiring whether there was "[a]ny update" about setting up a time for the Demo of the AirWatch Software and to discuss the details of Havenswright's free trial of the AirWatch Software.  Jeff "Woodhousen" signed his message as "Jake."  In response, Mr. Rhee indicated that he would send Mr. "Woodhousen" a meeting appointment for later that day.

6

22.     On or about Monday, July 16, 2012 at 5:00 p.m., Mr. Rhee met with Mr. "Woodhousen" to perform the Demo of the AirWatch Software and to discuss the details of the trial environment for "Havenswright."

23.     Following the Demo, on Tuesday, July 17, 2012, Mr. Rhee requested the physical mailing address for "Havenswright" from Mr. "Woodhousen" to document the terms of the proposed trial of the AirWatch Software.  In response, Mr. "Woodhousen" provided two addresses: 373 River Oaks Circle, Suite 2011, San Jose, California and 110 Nortech Parkway, San Jose, California.

24.     On or about Tuesday, July 17, 2012, Mr. Rhee forwarded Quote Number 00017584 (the "Quote") for a free trial of the AirWatch Software to Mr. "Woodhousen" for his review and signature.  The Quote provided that the free trial of the AirWatch Software would expire on August 16, 2012.  The Quote was conditioned upon the terms and conditions of the End User License Agreement ("EULA").

25.     On or about July 18, 2012, Mr. "Woodhousen" assented to the terms of the Quote and the incorporated EULA.

26.     The EULA provides, in relevant part, that "the Software is provided to User for evaluation purposes," and that it is a "license to use the software solely

7

for the purposes of testing and evaluating the software."  The EULA also provides that AirWatch is the "sole owner" of any and all intellectual property developed during any free trial.

27.     The EULA specifically provides that the User "shall not engage in competitive analysis."   The EULA specifically prohibits "disclos[ing] any AirWatch Confidential Information, including the Software, to any competitor of AirWatch."

28.     On July 18, 2012, AirWatch established a trial environment for "Havenswright" and provided access to Mr. "Woodhousen" subject to the terms of the EULA.  In connection with the free trial, "Havenswright" was given access to the AirWatch Resource Portal, which includes proprietary and confidential videos and documentation concerning the AirWatch Software.  "Havenswright" was also given access to the AirWatch ASK Portal, which allowed it to open support tickets in connection with the free trial of the AirWatch Software by "Havenswright."

29.     "Havenswright" accessed the AirWatch trial environment fifteen times between July 19, 2012 and July 21, 2012.

30.     On or about July 23, 2012, Mr. Rhee emailed Mr. "Woodhousen" to arrange a time to discuss the initial set-up of the "Havenswright" trial environment.

US2008 3852614 9

Mr. "Woodhousen" responded to Mr. Rhee's email the following day confirming that "Havenswright" had accessed the AirWatch test environment, had begun testing within that trial environment, and had questions resulting from the testing that it had completed.

31.     On or about July 26, 2012, Mr. Rhee, Mr. "Woodhousen," Mr. "Thompson," whom Mr. Rhee understood to be Mr. "Woodhousen's" colleague and another employee of "Havenswright," held an online meeting.  During the meeting, they discussed, among other things, the differences between the AirWatch Software and similar solutions offered by Mobile Iron and MaaS360, the integration capabilities of the AirWatch Software, Certificate Authority utilization, and AirWatch's shared device application.

32.     Following the online meeting, on or about July 30 and 31, 2012, Mr. "Woodhousen" sent two email messages to Mr. Rhee, asking whether additional information was available that might address the issues he raised during the July 26 online meeting.

33.     On or around July 31, 2012, Mr. "Woodhousen" contacted AirWatch Trial Support and initiated a ticket concerning integration issues related to the AirWatch software.

9

34.     On July 31, 2012, and in response to Mr. "Woodhousen's" inquiry to AirWatch Trial Support, Mr. Rhee responded to Mr. "Woodhousen" by email, assured Mr. "Woodhousen" that he would soon hear from AirWatch Trial Support, and provided Mr. "Woodhousen" an overview of the AirWatch "Certificate-Based Authentication with Exchange ActiveSync (EAS), AirWatch, & ADCS." Mr. Rhee also offered Mr. "Woodhousen" a discount if "Havenswright" elected to purchase the AirWatch Software by August 31, 2012.

35.     On or about August 2, 2012, Mr. "Woodhousen" had a call with AirWatch Trial Support concerning certain features of the AirWatch software, including Sharepoint integration and Certificate Authority.

36.     From August 8, 2012 through August 14, 2012, "Havenswright" accessed the AirWatch Software trial environment at least twenty times.

37.     On or about August 14, 2012, Mr. Rhee sent an email to Mr. "Woodhousen" and Mr. "Thompson" to follow-up about any open support items and as a reminder that the free trial of the AirWatch Software would expire on Friday, August 17, 2012.

38.     On or about August 15, 2012, "Havenswright" accessed the AirWatch trial environment three times.

US2008 3852614 9

39.     On August 15, 2012, AirWatch sent Mr. "Woodhousen" an automated reminder that that "Havenswright's" free trial of the AirWatch Software would expire on Friday, August 17, 2012.

40.     On August 15, 2012, Mr. "Woodhousen" sent an email to Mr. Rhee indicating his desire to schedule a call early during the week of August 20, 2012. Mr. "Woodhousen" further indicated "[w]e really like what we're seeing with AirWatch.  We do intend to make a vendor decision by [the] end of August, but we are also a bit behind in our evaluation.  I'm hoping we can get a 2 week extension on our trial if possible.  Your competitors have helped us out there."  Mr. Rhee responded by suggesting that they "synch up" about the trial on Wednesday, August 15.   Mr. "Woodhousen" was not available on August 15 and instead proposed a call on Thursday, August 16.

41.     On August 15, 2012, Mr. Rhee circulated a meeting appointment for the proposed meeting with Mr. "Woodhousen" scheduled for August 16, 2012. The meeting appointment was directed to Mr. "Woodhousen" and was forwarded by Mr. "Woodhousen" to Jake Woodhams at Mr. Woodham's Mobile Iron e-mail address.

11

42.     In response to the meeting invitation, on or about August 16, 2012, Mr. Rhee received an email notification that Jake Woodhams had tentatively accepted the appointment.

43.     Although Mr. "Woodhousen," Mr. "Thompson," and Mr. Rhee tentatively planned to meet on Thursday, August 16, Mr. Rhee requested that the meeting be rescheduled for Monday, August 20 because of a scheduling conflict.

44.     On or about August 17, 2012, "Havenswright" accessed the AirWatch trial environment three times.

45.     On or about August 17, 2012, the free trial for "Havenswright" of the AirWatch Software expired by the terms of the Quote executed by "Jeff Woodhousen."

46.     On or about August 18, 2012, after the expiration of the term of the free trial, "Havenswright" accessed the AirWatch trial environment twice.

47.     During the course of the free trial of the AirWatch Software, the Mr. "Woodhousen" and Mr. "Thompson" gained access to the confidential, proprietary, and trade secret information of AirWatch, the disclosure of which is governed by the EULA.  Altogether, Mr." Woodhousen" and  Mr. "Thompson"

accessed the AirWatch trial environment at least forty-three times in the course of approximately thirty days.

**AirWatch's Discovery of Mobile Iron's Fraudulent Scheme**

48.    On Monday, August 20, 2012, as planned, Mr. Rhee received a call from Mr. "Woodhousen."  During that call, Mr. Rhee noticed that the visual display on his landline work telephone indicated that the incoming call had been placed by Mobile Iron using the number (650) 963-6417.  Mr. Rhee asked Mr. "Woodhousen" whether he was calling from his primary landline.  Mr. "Woodhousen" confirmed that he was, in fact, calling from his primary landline. Upon discovering that Mr. "Woodhousen" had placed the call to Mr. Rhee from a telephone number associated with an AirWatch competitor, Mobile Iron, Mr. Rhee ended the call.

49.    Prior to the call on August 20, 2012, all previous calls from Mr. "Woodhousen" to Mr. Rhee were made from (408) 634-0805, a Google voice number.

50.    On Monday, August 20, 2012, after it became clear to Mr. Rhee that "Jeff Woodhousen" was a Mobile Iron employee, and immediately following the

call by Mr. Woodhousen from his Mobile Iron telephone number, AirWatch disabled any access by "Havenswright" to the free trial of the AirWatch Software.

51.    On Monday, August 20, 2012, Mr. Rhee reviewed the prior emails from "Jeff Woodhousen" and "Jacob Thompson."

52.    In reviewing previous emails exchanged with Mr. "Woodhousen" and Mr. "Thompson," Mr. Rhee learned for the first time that, on August 16, 2012, "Jeff Woodhousen" forwarded Mr. Rhee's meeting invitation for the proposed August 16 meeting to "Jacob Thompson" and that the email confirmation from "Jacob Thompson" on August 16 included the return email address of jwoodhams@mobileiron.com.

53.    On information and belief, Jake Woodhams has been employed by Mobile Iron as the Director of Technical Marketing since at least May 2012.

54.    Mr. Woodhams and another Mobile Iron employee (the "Mobile Iron Employees") fraudulently misrepresented their identities and used the aliases "Jacob Thompson" and "Jeff Woodhousen" to masquerade as employees of "Havenswright," a fictitious real estate company, to gain access to the AirWatch Software and to AirWatch confidential, proprietary, and trade secret information for the benefit of Mobile Iron.

14

55.    By participating in conference calls with AirWatch personnel, through testing the AirWatch Software, and through access to the AirWatch Resource Portal,  and the AirWatch ASK Portal, the Mobile Iron Employees, for the benefit of Mobile Iron, learned technical details about the AirWatch Software and its functionality, and acquired information about AirWatch's confidential and proprietary marketing strategies and pricing information, which information constitutes AirWatch's confidential, proprietary, and trade secret information.

56.    On information and belief, Mobile Iron has used and is currently using the AirWatch trade secrets and confidential information that the Mobile Iron Employees gained improperly for the purpose of gaining an unfair competitive advantage over AirWatch by, among other things, relying on AirWatch confidential and trade secret information to develop marketing materials and other derivative works.

**Communications Between AirWatch and Mobile Iron**

57.    On August 23, 2012, AirWatch sent a letter to Mobile Iron President and CEO Bob Tinker concerning the duplicitous activities of the Mobile Iron Employees and "demand[ed] that Mobile Iron immediately cease and desist from using any and all information that Mobile Iron's employees, including Jake

15

Woodhams, obtained from AirWatch or that Mobile Iron has learned through its free trial for the AirWatch solution."

58.     On or about August 31, 2012, Bob Tinker, CEO of Mobile Iron, sent an email (Exh. A) to Alan Dabbiere, Chairman of AirWatch and John Marshall, CEO of AirWatch, in response to the August 23 correspondence from AirWatch's counsel.

59.     In his August 31, 2012 email, Mr. Tinker indicated that he "wanted to respond personally," to the issues raised by AirWatch's August 23, 2012 letter, that Mobile Iron was investigating the issues raised by AirWatch, and that he proposed a face-to-face meeting to "Man-Up on the situation personally."

60.     On September 17, 2012, Mr. Tinker traveled to Atlanta and met with Mr. Alan Dabbiere (the "September 17 Meeting").

61.     Following the September 17 Meeting, AirWatch requested that Mobile Iron respond in writing to the concerns raised by AirWatch's August 23, 2012 letter.

62.     Since the September 17 Meeting, AirWatch has not received any response from Mobile Iron that substantively addresses the questions in AirWatch's August 23, 2012 letter.

## Count I – Computer Fraud and Abuse Act – 18 U.S.C. § 1030 *et seq.*

63.     AirWatch repeats and incorporates the allegations of Paragraphs 1 through 62 above as if fully set forth herein.

64.     The Computer Fraud and Abuse Act ("CFAA") provides a cause of action against any individual or corporation who "intentionally accesses a computer without authorization or exceeds authorized authority, and thereby obtains . . . information from any protected computer."  18 U.S.C. § 1030(a)(2).

65.     The CFAA provides that, "[Whoever] knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value . . . shall be punished."  18 U.S.C. § 1030(a)(4).

66.     A "protected computer" is any computer "which is used in or affecting interstate or foreign commerce."  18 U.S.C. § 1030(e)(2).

67.     The AirWatch Software and AirWatch's computers and information technology systems, including the AirWatch Resource Portal and the AirWatch ASK Portal (collectively, the "AirWatch Computers"), are used in and affect interstate commerce.

US2008 3852614 9

68.     The Mobile Iron Employees fraudulently misrepresented their identities and masqueraded as employees of "Havenswright," and with the intent to defraud, and thereby gained access to a free trial of the AirWatch Software and to the AirWatch Computers for the purposes of obtaining, for the benefit of Mobile Iron, AirWatch's confidential and proprietary information.

69.     As a direct and proximate result of the Mobile Iron Employees' fraudulent actions to gain access to the AirWatch Software for the benefit of Mobile Iron, AirWatch has suffered irreparable harm and damages in excess of $5,000.

70.     Under 18 U.S.C. § 1030(g), AirWatch is entitled to compensatory damages and injunctive relief.

## Count II – Misappropriation of Trade Secrets Under the Georgia Trade Secrets Act , O.C.G.A. § 10-1-76, *et seq.*

71.     AirWatch repeats and incorporates the allegations of Paragraphs 1 through 62 above as if fully set forth herein.

72.     The Georgia Trade Secrets Act, O.C.G.A. § 10-1-76, *et seq.*, prohibits "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [u]sed improper means to acquire knowledge of a trade secret;

18

[or] [a]t the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

> (I) Derived from or through a person who had utilized improper means to acquire it;
>
> (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .

O.C.G.A. § 10-1-76(2).

73.     "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." *Id.* § 10-1-76(1).

74.     The Mobile Iron Employees misappropriated AirWatch's protected trade secrets and confidential information by fraudulently misrepresenting their identities to obtain a free trial of the AirWatch Software and to acquire access to other trade secrets and confidential information of AirWatch.

75.     The confidential information and trade secrets that the Mobile Iron Employees obtained through improper means derive independent economic value, actual or potential, from not being generally known to the public or to other

US2008 3852614 9

persons and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

76.    Mobile Iron's use of AirWatch's trade secrets is causing, and will continue to cause, AirWatch substantial and irreparable injury.

77.    Pursuant to Georgia Trade Secrets Act, O.C.G.A. § 10-1-762, AirWatch is entitled to injunctive relief to prevent Mobile Iron's retaining and using AirWatch's trade secrets.

78.    AirWatch seeks compensatory damages against Mobile Iron in an amount to be proved at trial.  AirWatch further seeks an award of attorneys' fees under O.C.G.A. § 10-1-764, as well as exemplary damages based on Mobile Iron's employees' willful and malicious misappropriation, pursuant to O.C.G.A. § 10-1-763.

### Count III – Fraudulent Business Practice Under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

79.    AirWatch repeats and incorporates the allegations of Paragraphs 1 through 62 above as if fully set forth herein.

80.    The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*., defines unfair competition to include any "unlawful," "unfair," or "fraudulent" business act or practice. Cal. Bus. & Prof. Code § 17200.

81.     Mobile Iron's conduct, as alleged above, constitutes unlawful, unfair and/or deceptive acts and practices within the meaning of  Cal. Bus. & Prof. Code § 17200.

82.     The Mobile Iron Employees fraudulently misrepresented their identities to obtain a free trial of the AirWatch Software and to acquire access to other trade secrets and confidential information of AirWatch.

83.     On information and belief, Mobile Iron has used, and is currently using, the AirWatch trade secrets and confidential information for the purpose of gaining an unfair competitive advantage over AirWatch, by among other things, relying on AirWatch confidential and trade secret information to develop marketing and competitive materials to improve its position within the marketplace.

84.     As a result of Mobile Iron's unlawful and fraudulent conduct, AirWatch has suffered irreparable injury.

85.     Pursuant to California Business and Professions Code § 17203, AirWatch is entitled to restitution and injunctive relief for Mobile Iron's unlawful and fraudulent conduct.

US2008 3852614 9

## Count IV – Fraudulent Misrepresentation

86.     AirWatch repeats and incorporates the allegations of Paragraphs 1 through 62 above as if fully set forth herein.

87.     Beginning on July 12, 2012 and continuing until August 20, 2012, the Mobile Iron Employees falsely represented that they were evaluating the AirWatch Software for potential purchase by a company called "Havenswright."

88.     In the Mobile Iron Employees' e-mails and other correspondence with AirWatch, the Mobile Iron Employees consistently represented that they were employees of "Havenswright," which they represented was a commercial real estate company based in California.

89.     "Havenswright" is a fictitious real estate company and the Mobile Iron employees are employees of Mobile Iron, not "Havenswright."

90.     At the time of their misrepresentations, the Mobile Iron Employees knew their representations were false.

91.     The Mobile Iron Employees intended for AirWatch to rely on their misrepresentations and to provide "Havenswright" a free trial of the AirWatch Software.

92.     AirWatch, having no knowledge that the representations identified above were not truthful, reasonably and actually relied on the Mobile Iron

22

Employees' misrepresentations and provided "Havenswright" a free trial of the AirWatch Software and other AirWatch confidential information.

93.     As a result of Mobile Iron's unlawful and fraudulent conduct, AirWatch has suffered damages.

## IN THE ALTERNATIVE

### Count V – Breach of End User License Agreement

94.     AirWatch repeats and incorporates the allegations of Paragraphs 1 through 62 above as if fully set forth herein.

95.     On or about July 18, 2012, Mobile Iron executed the AirWatch EULA.

96.     The EULA provides, in relevant part, that "the Software is provided to User for evaluation purposes," and that it is a "license to use the software solely for the purposes of testing and evaluating the software."

97.     The EULA provides that the User "shall not engage in competitive analysis."

98.     The EULA provides that AirWatch is the "sole owner" of any and all intellectual property developed during any free trial.

99.    Mobile Iron breached the EULA by, among other things, using the AirWatch Software for purposes separate and different from "testing and evaluating the software" as a potential AirWatch customer.

100.   On information and belief, Mobile Iron breached the EULA by, among other things, using the AirWatch Software to engage in a "competitive analysis" and to develop marketing materials and other derivative works.

101.   AirWatch has been damaged by Mobile Iron's breaches of the EULA in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff AirWatch respectfully requests:

a.    That the Court issue an injunction (1) enjoining Mobile Iron from using any AirWatch information obtained through Mobile Iron's free trial of the AirWatch Software, including (without limitation) software source code, software deployed to mobile devices, marketing and pricing information, and information derived from the AirWatch Resource Portal or the AirWatch ASK Portal; and (2) enjoining Mobile Iron from retaining any tangible materials or documents obtained through Mobile Iron's free trial of the AirWatch Software, including (without limitation) software source code, software deployed to mobile

24

devices, and marketing and pricing information, and information derived from the AirWatch Resource Portal or the AirWatch ASK Portal, including (without limitation) all Mobile Iron marketing and competitive materials that were developed with the foregoing information;

b.     That the Court enter judgment on AirWatch's claims against Mobile Iron in the amount to be proven at trial;

c.     That the Court award AirWatch compensatory damages for Mobile Iron's accessing AirWatch's computers and confidential information in violation of the Computer Fraud and Abuse Act;

d.     That the Court award AirWatch compensatory damages for the misappropriation of AirWatch's trade secrets and other confidential information;

e.     That the Court award AirWatch compensatory damages for Mobile Iron's unfair and deceptive business practices;

f.     That the Court award AirWatch compensatory damages for Mobile Iron's fraudulent misrepresentations;

g.     That the Court award AirWatch punitive damages for Mobile Iron's willful and malicious conduct;

h.     In the alternative to fraud, that the Court award AirWatch its damages for Mobile Iron's breach of the EULA;

i.     That the Court declare that, under the terms of the EULA, AirWatch is the "sole owner" of any derivative works developed by Mobile Iron with the AirWatch Software and other information received in connection with the free trial;

j.     That all costs of this action be assessed against Mobile Iron;

k.     That the Court award AirWatch its reasonable attorneys' fees and costs of litigation pursuant to 18 U.S.C. § 1030 *et seq.* (CFAA) and the Georgia Trade Secrets Act, O.C.G.A. § 10-1-764; and

l.     For such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.

US2008 3852614 9

This 12th day of October, 2012.

/s/ Joel D. Bush, II

Joel D. Bush, II
Georgia Bar No. 098775
jbush@kilpatricktownsend.com
Jeffrey H. Fisher
Georgia Bar No. 981575
jfisher@kilpatricktownsend.com
**KILPATRICK TOWNSEND &**
   **STOCKTON LLP**
Suite 2800 – 1100 Peachtree Street
Atlanta, GA  30309-4530
Phone:  (404) 815-6500
Fax:      (404) 815-6555

27

# EXHIBIT A

**From:**          Bob Tinker <btinker@mobileiron.com>
**Sent:**          Friday, August 31, 2012 5:51 PM
**To:**            Alan J. Dabbiere; John Marshall
**Subject:**       Personal note

Alan and John,

Excuse the unsolicited email to you two.   We received the letter from your lawyers.  I wanted to respond personally.

I appreciate you bringing these issues to my attention.  Airwatch is a great competitor.  We seek to compete fairly and appropriately with you;  we take these allegations seriously.

We've had a chance to look into the issues you've raised.  I suggest that we meet face to face so I can Man-Up on the situation personally to you.  I'll share what we found, what we've already done and what we are planning to do---we can talk----rather than working through our respective attorneys.

I'd be happy to come to Atlanta (or Washington) anytime next week to sit down with just the two of you, CEO to Chairman and CEO.  If you could accommodate some time in your schedule early next week...perhaps Wed...I will make it work.

If, instead, you prefer to work through the lawyers, that is of course your choice and we'll respond accordingly.

Thanks in advance for your consideration and time.

Regards,
Bob

Bob Tinker |  CEO, MobileIron  | www.mobileiron.com